# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENISE STEFFENS, | CASE NO. 08cv1494-LAB (BLM) |
| Plaintiff, | **ORDER DENYING REGUS'S MOTION FOR A NEW TRIAL** |
| vs. | |
| REGUS GROUP, PLC; REGUS MANAGEMENT GROUP, LLC; REGUS EQUITY BUSINESS CENTERS, LLC; REGUS BUSINESS CENTER, LLC; HQ GLOBAL WORKPLACES, LLC; THE REGUS GROUP, PLC; SANDE GOLGART; SHARON EDMONSON; and DOES 1-10, | |
| Defendants. | |

This case went to trial and Regus lost—badly. The jury awarded Denise Steffens $296,252 in economic damages, $850,000 in non-economic damages, and $3.5 million in punitive damages. Now, with $4,646,252 on the line, Regus has filed a motion for a new trial that tries to blame its loss on legal missteps by the Court, improper statements by Steffens's counsel, and misconduct by the jury, rather than the actual testimony and arguments the jury heard. The motion is **DENIED**. The Court's only error in this case, apparently, was giving Regus false hope that Steffens had no case by initially entering summary judgment in its favor, a ruling that in retrospect was obviously mistaken.

//

## I. Subject Matter Jurisdiction

Regus first argues—and argues for the first time—that this entire case is preempted under the National Labor Relations Act, and that the Court therefore lacks subject matter jurisdiction. The basis for this argument is *Romero v. DirecTV*, 2013 WL 453883 (Cal. Ct. App., Feb. 7, 2013). *Romero*, however, was decided before this case even went to trial, and Regus concedes it "is not published and not binding on this court." (Doc. No. 152-1 at 1.) 2013 WL 453883 (Cal. Ct. App., Feb. 7, 2013). Indeed it is not. The Court doesn't have to rely on these technical points to reject Regus's preemption argument, though, because it fails on the merits.

*Romero* dealt with so-called *Garmon* preemption, a reference to the Supreme Court's decision in *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959). The plaintiff in Garmon was an employer in the lumber industry. The defendant was a picketing union, interested in organizing its employees. *Id.* at 237. The employer sued for both injunctive relief (to stop the picketing) and damages (lost earnings, essentially), and the question before the Supreme Court was whether the National Labor Relations Act precluded a California court from finding that the picketing was an unfair labor practice and awarding the employer damages. The Supreme Court held that it did, because the picketing activity at issue was "arguably subject" to sections 7 and 8 of the Act. *Id.* at 245.

Section 7 of the Act establishes a sphere of protected employee activity:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized. 29 U.S.C. § 157.

Section 8, on the other hand, defines a number of unfair labor practices by both employers and unions. For example, it's an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 . . . ." 29 U.S.C. § 158. As the Supreme Court saw it, because the core claim in *Garmon* was that the union's picketing was an unfair labor practice, it was arguably "within the compass of

section 7 or section 8 of the Act." *Id.* at 246. And that meant "the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.* at 245.

Reading *Garmon* by itself, one would never think it's relevant here and that Steffen's claim against Regus is preempted under the NLRA. The best evidence of this is Regus's own failure to assert *Garmon* preemption until now, almost five years after this case was filed *and* after a jury verdict against it. And it's not just the substantive differences between the claims in the cases—a company alleging unfair labor practices against a picketing union in *Garmon* versus an individual alleging a wrongful termination against her employer here. There is more. First, section 7 of the NLRA, at least at its core, protects the collective action, or "concerted activities," of employees, not the one-off and mostly self-interested grievance of a single employee. *See N.L.R.B. v. City Disposal* Sys., 465 U.S. 822, 830 (1984) ("The term 'concerted activity' is not defined in the Act but it clearly enough embraces the activities of employees who have joined together in order to achieve common goals."); *N.L.R.B. v. Mike Yurosek & Son, Inc.*, 53 F.3d 261, 264 (9th Cir. 1995) ("To be engaged in 'concerted activity,' an employee must act with or on behalf of other employees, and not solely by and on behalf of the . . . employee himself.") (internal quotations and citation omitted). Second, supervisors aren't considered employees under the NLRA, meaning their activities aren't protected by section 7. *See* 29 U.S.C. § 152(3). Both of these points cut strongly against the application of *Garmon* to this case.

This is where *Romero* comes in. In essence, *Romero* bridges the ostensible gap between *Garmon* and this case by finding *Garmon* preemption of what was basically a wrongful termination claim. The plaintiff was a supervisor with DirecTV who alleged that he was fired for complaining to upper management that technicians were being paid by the project rather than by the hour, in violation of the labor laws. The same two barriers to preemption the Court just identified in this case were present, however: (1) the NLRA protects only concerted activity; and (2) supervisors aren't "employees" under the Act. So why was the case preempted under the NLRA nonetheless?

On the concerted action point, it noted that "courts have found that an individual employee who complains to management on behalf of others may be engaged in concerted activity." 2013 WL 453883 at *3. That's true. *See N.L.R.B. v. Talsol Corp.*, 155 F.3d 785, 796 (6th Cir. 1998) ("For an individual's complaints to constitute concerted action . . . they must not have been made solely on behalf of an individual employee, but they must be made on behalf of other employees or at least with the object of inducing or preparing for group action.") (internal quotations and citation omitted); *Haney v. Aramark Uniform Servs, Inc.*, 121 Cal.App.4th 623, 635 (Cal. Ct. App. 2004). More importantly, Romero's complaint did allege concerted action under this definition. He alleged, specifically, that he complained to management on behalf of "the concerns of the production technicians," and from this the court reasoned that "[i]t can reasonably be inferred that management was aware Romero was complaining on behalf of other employees and not himself because he was a supervisor and not one of the production technicians who was allegedly underpaid." *Id.* at *2. It was even part of his job description, he alleged, to do just this. *Id.* at *1.

Context is everything here, and in its proper context it's very clear that Steffens's complaint about meal and rest breaks wasn't concerted action in any conceivable way. Steffens "complained" about employees not receiving their meal and rest breaks *not* on the employees' behalf, and *not* to call them to action, but rather to defend herself against the charge that the Regus center she was managing was underperforming. Here's the relevant testimony:

> Q: At some point, did the issue of the legality of not giving meals — lunch and rest breaks come up?
>
> A: Yes.
>
> Q: Would you tell the jury how that came up?
>
> A: When we were discussing sales and how I was going to reach my target goals, I explained that my focus on sales sometimes wasn't what I wanted it to be because I would get drawn into a lot of the operational issues in the center. And with the heavy workload in the center, I felt like we were understaffed to take care of the work for the clients. And as a result of that understaffing, my hourly employees were not able to take their rest breaks and sometimes their meal breaks . . . .

> Q: So what did you say about the legality or illegality of lunch breaks and rest breaks?
>
> A: I told him that I thought due to the understaffing, we couldn't take — they couldn't take their meal breaks and rest breaks and that I knew it was against California law, and I wanted to bring it to his attention and see if we could do something about that. (3/19/13 Tr. at 54:11–55:11.)

In other words, Steffens raised the meal and rest break issue in the context of explaining that, in her view, understaffing at the center prevented her from doing her actual job. She didn't raise it to initiate a conversation about Regus's labor practices, or out of concern for the rights and well-being of the center's employees.[1] While Sande Golgart, Steffens's surpervisor, denied that she ever raised meal and rest breaks, his own testimony corroborates that she complained of being spread thin at the center and unable to focus on sales work:

> Q: There was a discussion about staffing and about her doing the work of her CSR's?
>
> A: Yes. I wouldn't call it a discussion. She said she couldn't get the work done. I asked some questions about the team and the staff and directed her to call Mark Sorum. (3/20/13 Tr. at 188:15–23.)

The testimony of another witness, Shannon Jones, also confirmed that Steffens raised the meal and rest break issue in the broader context of a conversation about the center's performance and her own sense that understaffing diverted her attention away from her own responsibilities.

> Q: What did you start talking about in that meeting?
>
> A: Sure. So we started off talking in the meeting about work stations, the offices that were open, what we had coming up as far as renewals. That's what the conversation was . . . .
>
> Q: His discussion with Denise regarding work stations wasn't any different than discussions he was having that day with other general managers that you attended with him?

---

[1] Yes, Steffens did say "I wanted to bring [the meal and rest breaks] to his attention and see if we could do something about that." But even there, it's clear enough that Steffens was more concerned about the center's own performance, her own productivity, or perhaps Regus avoiding a lawsuit, than she was about the collective interests of the center employees.

A: Same conversation . . . .

Q: Did Denise Steffens raise the issue of understaffing with Mr. Golgart during this meeting?

A: Yes, she did.

Q: What did she say?

A: She stated that the center was understaffed, we're having turnover in the staff, the staff was not able to take breaks, the staff was not able to have meals all the time, and that the process was illegal and that — I mean, she really laid it out there. (3/19/13 Tr. at 195:19–196:24.)

Yes, Steffens did testify, "I wanted to bring [the meal and rest breaks] to his attention and see if we could do something about that." But even there, it's clear enough in context that Steffens was more concerned about the center's own performance, her own productivity, or perhaps Regus avoiding a lawsuit, than she was about the collective interests of the center employees.

*Romero* stresses that an individual's complaints may constitute concerted action only when they're made on behalf of other employees, or made to further some collective purpose. But the testimony here cuts against such a finding with respect to Steffens's complaints, which were motivated by her concerns about the center's own performance, her ability to do her job, and Regus avoiding a lawsuit. So, this takes care of the "concerted activities" point; the Court finds that Ms. Steffens's complaint doesn't concern "concerted activities" such that it implicates the NLRA and is preempted under *Garmon*. And this is assuming—a huge assumption, the Court must stress—that the Court is obligated to consider *Romero*, an unpublished decision from the California Court of Appeal, in the first instance.

Even if the Court *were* to find that *Romero* is authoritative, and *were* to find that Steffens's complaint about meal and rest breaks was "concerted" activity, it would still face the law that supervisors aren't considered employees under the NLRA. The court in *Romero* got around this by recognizing that "federal and state courts have found that firing a supervisor can constitute a section 8(a)(1) violation when such firing has the effect of

interfering, not with the supervisor's rights, but with the section 7 rights of nonsupervisors, for example their right to seek collective redress for their mutual aid or protection." *Romero*, 2013 WL 453883 at *3. Those aren't even remotely the facts of this case, though. Steffens's termination didn't impact in any way the ability of Regus employees to come together to complain about not receiving meal and rest breaks. She wasn't representing them when she raised the lack of meal and rest breaks with Golgart, nor was she necessarily the person they would have rallied behind had they wanted to force the issue. The motion to dismiss for lack of subject matter jurisdiction is **DENIED**.

**II.    Jury Instructions and Verdict Form**

Regus's first crack at a new trial seizes on the instructions and verdict form the jury received, which Regus argues were erroneous in a number of ways. Considering that Regus leads with these arguments in its motion for a new trial, and led with them at oral argument, the Court presumes they represent Regus's deepest grievances. Indeed, during the recent hearing on Regus's motion, counsel said, without holding back, that Regus believes fundamentally it was denied a fair trial by the allegedly hasty manner that the Court assembled and drafted the jury instructions, as well as by assorted evidentiary rulings. At that time that seemed like hyperbole, and quite frankly it still does. Several preliminary observations. First, Regus was represented in this case, and at trial, by a number of experienced lawyers, and certainly invested great resources in its defense. So, the Court is quite skeptical that Regus couldn't keep up with the Court's pacing or various rulings at trial (particularly bearing in mind that time limits for the trial had been discussed with counsel and set at the pretrial conference). Second, if Regus really believes it was denied a fair trial *by the Court*, it would have—or at least should have—filed a motion for a new trial that made a limited number of arguments it could truly stand behind. Regus didn't do that, though. Instead, it combed through the record (as well as the jury's deliberations to the extent it was able) and then filed a 50-page motion for a new trial that crammed as many arguments as would fit, some of which are absolute non-starters. That is not the brief of a party that sincerely believes it wasn't given a fair trial; it is the brief of a party that lost at trial and will

now say or argue anything to avoid the result.  Third, many of the arguments Regus makes in its motion were never made at trial.  The Court has gone out of its way to consider all arguments in the motion for a new trial on their merits, but it does so very mindful that it is considering those arguments now for the first time and, in so doing, is largely overlooking the question of waiver.  Fourth, the spirit of Regus's motion for a new trial on these issues is that it had some kind of right to have *its* instructions given to the jury and *its* verdict form used.  This is obviously wrong.  As the Court will reiterate below, jury instructions have to get the law right, but how they're arranged and styled, and how they relate to the verdict form, is largely left to the Court's discretion.  The Court *never* gives every instruction that a party requests, or the exact verdict form it submits.  With those preliminary points in mind, the Court will answer Regus's arguments in order.

## A.    "Substantial Motivating Reason"

The instruction the jury received on Steffens's substantive claim—wrongful termination in violation of public policy—required her to prove by a preponderance of the evidence that "Plaintiff's reports about meal and/or rest breaks were a motivating reason for her termination.  A motivating reason is one that is substantial or non-trivial, even if other reasons also contributed to the decision."  (Doc. No. 144 at 12.)  Regus argued at trial, and argues now, that "motivating reason" isn't enough, and that Steffens's report must have been a *substantial* motivating reason for her termination.  It makes this argument even though the CACI instruction for a wrongful discharge in violation of public policy claim requires only that the plaintiff's conduct "was a motivating reason" for her termination.  *See* CACI 2430.

Initially, Regus relied on *Horsford v. Bd. of Trs. of Cal. State Univ.*, 132 Cal.App.4th 359, 377 (Cal. Ct. App. 2005), which held that "[a] plaintiff's burden is . . . to produce evidence that, taken as a whole, permits a rational inference that intentional discrimination was a substantial motivating factor in the employer's actions toward the plaintiff."  (Doc. No. 146 at 6.)  But this statement in *Horsford* pertained to a racial discrimination claim brought under the Fair Employment and Housing Act, not a claim of wrongful termination in violation of public policy (although there was such a claim asserted in the case).  *Id.* at 375 ("A plaintiff

- 8 -

in a racial discrimination action has the burden of proving . . . that the plaintiff's race was a substantial factor in the adverse employment decision.").

During trial—and now—Regus cited *Harris v. City of Santa Monica*, 56 Cal.4th 203, 232 (2013), which held that "[r]equiring the plaintiff to show that discrimination was a *substantial* motivating factor, rather than simply a motivating factor, more effectively ensures that liability will not be imposed based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision." Like *Horsford*, however, *Harris* was an FEHA discrimination case, and in fact, the holding Regus latches onto turned entirely on a rigorous analysis of the FEHA's language and purpose. *Id.* at 223–32.

*Nonetheless*, the Court effectively gave the jury the very instruction Regus asked for, and now criticizes the Court for not giving. The relevant CACI instruction defines a motivating reason as "a reason that contributed to the decision to take certain action, even though other reasons also may have contributed to the decision." *See* CACI 2507. The Court modified this somewhat, however, instructing that "[a] motivating reason is one that is substantial or non-trivial, even if other reasons also contributed to the decision." (Doc. No. 144 at 12.) It based this decision largely on *Grant-Burton v. Covenant Care, Inc.*, 99 Cal.App.4th 1361 (Cal. Ct. App. 2002), which, unlike the cases cited by Regus, actually was a retaliation case; the employee-plaintiff alleged that she was fired for discussing bonus structures during a corporate meeting. (3/21/13 Tr. at 110:17–112:17.) Regus can try to argue that defining a motivating reason as "substantial or non-trivial" isn't the same thing as requiring that the reason itself be a "substantial motivating" one, but even if that's true: (1) that level of nuance is almost certainly lost on a jury; and (2) Regus still fails to offer a single wrongful termination in violation of public policy case that commands the "substantial motivating reason" language. Steffens's preferred "motivating reason" language, on the other hand, finds direct support in the CACI instruction and cases that have adopted it. *See, e.g.*, *Casella v. SouthWest Dealer Servs., Inc.*, 157 Cal.App.4th 1127, 1140 n.4 (Cal. Ct. App. 2007).

//

The Court didn't err in instructing the jury that Steffens's reports about meal and rest breaks had to have been "a motivating reason" for her termination rather than "a substantial motivating reason for her termination. Regus's request for a new trial on this ground is **DENIED**.

## B. Regus's Intent

Regus requested that the substantive instruction on Steffens's claim require her to prove "That Regus intended to discharge Ms. Steffens because of her report that Regus violated the law by not providing hourly employees meal and rest breaks." (Doc. No. 146 at 9.) The instruction the Court gave, however, required Steffens to prove that "Defendant terminated Plaintiff in retaliation for making the reports." (Doc. No. 144 at 12.)

Once again, Regus cited to a FEHA case for its preferred language, albeit an FEHA case closer to this one because it involved a retaliation rather than a discrimination claim. *See Joaquin v. City of Los Angeles*, 202 Cal.App.4th 1207, 1230 (Cal. Ct. App. 2012) ("As we have noted, retaliatory intent is an essential element of a cause of action for unlawful retaliation under FEHA."). Still, even though the CACI instruction, CACI 2430, doesn't explicitly require a showing of intent, the Court accommodated Regus:

> Also, the *Joaquin* case does suggest that it's error not to tell the jury that the retaliation was intentional. So I've modified that without using the word 'intentional.' I've changed the second element. I think it's the — the third element, actually, that defendant terminated plaintiff in retaliation for making reports, which conveys, of course, an intentional act that is cause-driven. (3/21/13 Tr. at 113:9–15.)

The Court stands by that ruling now. By instructing the jury that Regus's termination of Steffens had to be in retaliation for her complaints about meal and rest breaks, it was giving the very intent instruction that Regus asked for. A defendant is entitled to a jury instruction that reflects the law, but "he is not entitled to his choice of wording in the instruction." *U.S. v. Iverson*, 162 F.3d 1015, 1025 (9th Cir. 1998). Regus's request for a new trial because the relevant jury instruction left out the word "intended" is therefore **DENIED**.

//

//

08cv1494

### C. The Verdict Form

Regus next argues that the verdict form was inadequate because it failed to require separate, individualized findings on these elements of Steffens's claim. The verdict form simply read, "Did Defendant wrongfully terminate Plaintiff in violation of public policy? Yes or no?" It then asked the jury to award economic and non-economic damages, if any. (Doc. No. 143 at 1.)

Rule 49 of the Federal Rules of Civil Procedure broadly contemplates two kinds of verdicts: general verdicts that announce a legal conclusion and special verdicts that announce findings of fact. *Zhang v. American Gem Seafoods, Inc.* 339 F.3d 1020, 1031 (9th Cir. 2003). The Court has broad discretion to decide which kind of verdict to ask for, and this discretion "extends to determining the content and layout of the verdict form, and any interrogatories submitted to the jury, provided the questions asked are reasonably capable of an interpretation that would allow the jury to address all factual issues essential to judgment." *U.S. v. Real Property Located at 20832 Big Rock Dr., Malibu, Cal. 902655*, 51 F.3d 1402, 1408 (9th Cir. 1995); *see also Mateyko v. Felix*, 924 F.2d 824, 827 (9th Cir. 1991). In this case, leaving the punitive damages aside, the Court asked the jury to return a general verdict on Steffens's claim and announce damages, which is a perfectly proper thing to do. *See Zhang*, 339 F.3d at 1031.

But even more important, as long as a jury *instruction* properly defines the elements of a claim—and the Court has found that its instruction properly defined the elements of Steffens's claim—it is enough for the *verdict form* to ask only if the claim has been proven. The verdict form Regus submitted, by contrast, took each element of Steffens's claim and asked the jury to make a special finding with respect to it. (*See* Doc. No. 147.) This was simply unnecessary. At best it was superfluous, and at worst it sets up a series of forks in the jury's deliberations that prevent it from reaching a verdict. The Court stands by its explanation at trial:

> I'm not inclined to parse this thing. I get these verdict forms all the time that are multi-pages. It's like an S.A.T. test. I'm not going to do that here. Once they're properly defined on the elements of the claim, I don't see the need for a special verdict

> beyond one that says, 'Do you find that they retaliated against her in terminating her?' (3/20/13 Tr. at 271: 12–18.)

> Given that the elements are set forth in the charge, if they don't find them, then the answer is no. (3/20/13 Tr. at 272:19–21.)

Regus's request for a new trial because the verdict was not special enough, as it were, is **DENIED**.

Regus also argues that the verdict form was improper because the critical question—"Did Defendant wrongfully terminate Plaintiff in violation of public policy?"—didn't line up with the jury instructions. And this is because the critical, substantive jury instruction—the same one the Court has been discussing—didn't refer to the claim by its formal name. It merely said, "Plaintiff claims she was terminated by Defendant in retaliation for reporting that hourly workers were not receiving meal and rest breaks as required by California law. To establish this claim . . . ." (Doc. No. 144 at 12.) It didn't say "Plaintiff claims she was wrongfully terminated in violation of public policy. Here are the elements of that claim . . . ." Regus claims this invited the jury to "decide the case based on their own belief as to the meaning of 'wrongfully terminate,' which could have been simply a belief that the termination was 'wrong' in their eyes, regardless of whether it was unlawful." (Doc. No. 153 at 16.)

The Court disagrees. In the context of the entire trial, and looking at the jury instructions as a whole, it was made adequately clear to the jury that the only claim in this case was a claim alleging a wrongful termination in violation of public policy, and that the instruction at issue defined the elements of that claim. *See U.S. v. Doe*, 705 F.3d 1134, 1148 (9th Cir. 2013) ("Taking the instructions as a whole, and presuming, as we must, that the jurors followed the instructions as given . . . ."); *Swinton v. Potomac Corp.*, 270 F.3d 794, 802 (9th Cir. 2001) ("In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered."). In fact, in further instructions the Court did reference the claim by its official terms. In explaining that Steffens was an at-will employee, the Court said, "However, at-will employees may not be terminated for reasons that violate public policy such as reporting

- 12 -

violations of the law. That's against the law to do that." (3/21/13 Tr. at 169:7–9.) In instructing on damages, the Court said, "If you find that the defendant terminated the plaintiff in violation of public policy and is entitled to lost earnings, then you should ask yourselves the following questions . . . ." (3/21/13 Tr. at 170:19–24.) And when the Court finally submitted the case to the jury, it identified the first question on the verdict form as "a preliminary determination of whether the plaintiff's proved her case," a clear reference to the instruction. Even in their respective closing arguments, counsel for Steffens and Regus impliedly connected the formal claim at issue to the substantive instruction setting forth its elements. (*See, e.g.*, 3/21/13 Tr. at 192:7, 204:5–23, 210:18, and 211:20.) Regus's request for a new trial because a particular jury instruction didn't explicitly repeat that Steffens's claim was for a "wrongful termination in violation of public policy" claim is **DENIED**.

### D.    Meal and Rest Break Instruction

Steffens and Regus agree, and the Court agrees, that Steffens's wrongful termination claim didn't require her to prove that Regus was actually failing to give its employees meal and rest breaks. She needed to prove only that she had a good faith basis for believing it wasn't when she allegedly reported as much to Golgart. This is the law behind the Court's instruction that "Plaintiff must prove the following . . . . Plaintiff had a reasonably based suspicion that Defendant was denying its hourly workers meal and/or rest breaks in violation of California law, and she reported this to Defendant." (Doc. No. 144 at 12.) At trial, Regus also wanted an instruction that laid out the basics of California's meal and rest break law, and the Court refused to give it. (*See* 3/20/13 Tr. at 270:6–271:2.) Regus now argues that this was error, its theory being that the jury had to know what the law required in order to decide whether Steffens's had a reasonably based suspicion that Regus was violating it.

This isn't a frivolous argument, but the Court still rejects it. First, Regus cites no authority for the proposition that in a case of this kind the jury must be given a miniature lesson in the underlying law pertaining to the plaintiff's reports or complaints. Second, the Court doesn't believe that it's critical to the question whether Steffens reported the meal and rest break violations in good faith that the jury be instructed on the relevant, underlying law.

- 13 -

In fact, it may serve to only confuse their deliberations by suggesting that a plaintiff has to actually show that a defendant was engaged in unlawful conduct, in effect turning a wrongful termination case into a true meal and rest break case.  The Court stands by its refusal to instruct the jury on the substance of California's meal and rest break law, and it **DENIES** Regus a new trial on this ground.

### E.    Causation

Regus accuses the Court of not properly instructing the jury that Steffens's damages, if any, had to have been caused by her allegedly wrongful termination.  This is baseless.  In defining the elements of Steffens's wrongful termination claim, the Court said that Steffens had to prove she "suffered damages as a result of her termination."  (Doc. No. 144 at 12.) The very next instruction, pertaining to damages, said, "The economic damages in this case are the lost earnings incurred by Plaintiff as a result of Defendant's alleged conduct."  (Doc. No. 144 at 14.)  As for non-economic damages, the Court said, "It is entirely up to you, based on the evidence you have heard and your own common sense, to determine an amount that is fair compensation for the injuries Plaintiff alleges."  (Doc. No. 144 at 15.) Implicit in these instructions, if not explicit—"as a result" does, after all, mean "caused by"—was that Steffens is entitled to damages only for injuries that were actually caused by Regus's alleged misconduct, itself clearly defined for the jury as terminating Steffens for her reports about employees not being given meal and rest breaks.   And given those instructions, as the Court has said previously, there was no need for the verdict form to reiterate the obvious.

The Court understands Regus to be suggesting that the language "as a result of her termination" in the claim instruction wasn't clear that the termination actually had to be wrongful, and that the language "as a result of Defendant's alleged conduct" in the damages instruction" wasn't clear what the alleged conduct was.  "As a result," Regus claims, "the jury was not instructed to calculate only the damages for the harm that was caused by Regus's wrongful conduct."  (Doc. No. 153 at 10.)  Here is how the Court translates that: the Court allowed for the jury to find against Regus not because *it* did anything wrong, but simply

because *someone* had to compensate Steffens for the financial and emotional fallout of losing her job. That is preposterous. Nevermind that the actual instructions were plenty clear that this is a *wrongful* termination case and that any damages the jury awarded had to have been caused by such a termination, it would have been an outright insult to the jury's intelligence to further admonish it that its job wasn't to make Steffens whole irrespective of any misconduct on Regus's part. This was, after all, an adversarial civil trial in a court of law, with one party named the "Plaintiff" and another labeled the "Defendant."

As for the verdict form, the Court need only return to *Mateyko*, cited above, and make clear that its discretion "extends to determining the form of the special verdict, provided the questions asked are adequate to obtain a jury determination of the factual issues essential to judgment." 924 F.2d at 827. The form first asked, "Did Defendant wrongfully terminate Plaintiff," and only if it answered that question in the affirmative was the jury instructed to consider damages: "If you answered 'no,' stop. Date and sign this form. If you answered 'yes,' go on to the next question." (Doc. No. 143 at 1.) The clear message here was that Regus was responsible only for those damages caused by a wrongful termination, itself adequately defined by the Court in the substantive instructions. Regus's motion for a new trial on this issue is **DENIED**.[2]

### F.    Same Decision Defense

At trial, Regus wanted the following instruction, essentially telling the jury that Steffens could not recover if Regus could show it would have fired her anyway for some other reason, independent of her report and meal and rest breaks:

> If Denise Steffens proves that a substantial motivating factor in Regus's decision to discharge Denise Steffens was making a report that Regus violated the law by not providing meal and rest breaks to employees, Denise Steffens may not recover any

---

[2] In their respective briefing of this issue, the parties locate the Court's trial ruling in the March 20, 2013 transcript, between pages 248 and 258. As the Court reads those pages, however, they pertain to the instruction on the causal relationship between Steffens's reports about meal and rest breaks to her termination (basically, whether to give a *Harris* instruction), *not* on the causal relationship between any damages she suffered and misconduct on Regus's part.

08cv1494

damages if Regus proves that Regus would have made the same decision to discharge Denise Steffens even if Denise Steffens had not made the report. (Doc. No. 130 at 3.)

Regus's request was based on *Harris*, which the Court has already explained isn't controlling here because it involved a discrimination claim brought under the FEHA. This case, by contrast, involves a claim for wrongful termination in violation of public policy—a common law tort—premised on retaliation. Because of that difference, and in line with Steffens's objection, the Court was initially conflicted on whether to give the *Harris* instruction Regus requested or one similar to it. It heard extensive argument on this point, with Regus arguing that *Harris* applies and Steffens arguing that CACI instruction 2430 is all the law there really is. (*See* 3/20/13 Tr. at 243:7–259:10.) In the end, leaning not on *Harris* but other retaliation cases in California, the Court gave what was essentially a Harris instruction.[3]

The instruction was as follows:

If you find that Plaintiff's reports about meal and/or rest breaks were a motivating reason for her termination, then the burden of proof shifts to Defendant to establish, also by a preponderance of the evidence, that it would have made the same decision even if it had not taken into account the invalid motivating reason. In other words, Defendant must prove that it would have terminated Plaintiff regardless of the retaliatory reason.

If you find that Defendant terminated Plaintiff for both valid and invalid reasons, Defendant would not be liable for wrongful termination if it proves that it would have terminated Plaintiff regardless of the invalid reasons. (Doc. No. 144 at 12–13; *see also* 3/21/13 Tr. at 110:15–113:8.)

Regus now takes the position that this wasn't good enough. First, it used the words "a motivating reason" rather than "a *substantial* motivating reason." Second, the Court didn't define "liable for wrongful termination" in a way that tied it to the elements of Steffens's

---

[3] The other case was *Davis v. L.A. Unified Sch. Dist.*, 152 Cal.App.4th 1122 (2007)—although the Court would later clarify that this wasn't clearly a retaliation case and that the better authority was *General Dynamics Corp. v. Superior Court*, 7 Cal.4th 1361, 1379 (Cal. Ct. App. 2002). (*See* 3/21/13 Tr. at 118:8–15.) The Court gave this instruction despite its sense—which frankly is still its sense—that unlike *Grant-Burton* and *Davis* this is not a mixed motive case. Steffens claimed she was fired for complaining about meal and rest break violations in an October 2006 meeting with Golgart and Jones, and Regus denied that she made the complaint or that it had anything to do with her termination. As the Court said at the time, "The evidence is pretty stark here. Either she was fired for a legitimate reason wholly independent and disavowing and denying any illegitimate reason or she was fired for an illegitimate reason. It seems like it's one of those two choices. This doesn't seem like a mixed-motive case to me." (3/21/13 Tr. at 112:22–113:2.)

claim. Third, it didn't define the terms "valid" and "invalid." Related to this, it didn't clarify for the jury that merely disagreeing with Regus's decision to terminate Steffens wasn't grounds for finding against it. And fourth, the verdict form asked only if Regus wrongfully terminated Steffens without defining "wrongfully terminate" or asking if Regus would have reached the same decision for other, lawful reason. The Court addressed the first of these complaints above; it was enough to modify CACI 2430 and define "a motivating reason" as "one that is substantial or non-trivial."

The next argument, that the instruction "Defendant would not be liable for wrongful termination if it proves that it would have terminated Plaintiff regardless" was problematic, and runs into the same problem as Regus's grievances with the verdict form addressed above in section C. It is true that the lead-in to the instruction on Steffens's substantive claim was "Plaintiff claims she was terminated in retaliation for reporting that hourly workers were not receiving meal and/or rest breaks as required by California law" rather than "Plaintiff claims she was wrongfully terminated . . . ." (Doc. No. 144 at 12.) But the jury well knew, from the opening of this case through the presentation of evidence and closing arguments, that Steffens's claim was a wrongful termination claim.[4] And the instruction itself was as clear as it needed to be that the five elements Steffens had to prove were the elements of a wrongful termination claim. So, when the Court read the final line of the instruction, notwithstanding Regus's argument that the word "liable" requires further definition, it was plenty clear to the jury what it intended to say: Even if Steffens proved the five elements of her claim, she still loses if Regus can prove it would have fired her for some other, independent reason. Now, the Court could have actually said, "Steffens still loses," just like it could have said "Defendant wins," or "Steffens's claim fails," or "Steffens cannot recover," or "You must find for the Defendant," or, or any number of things. They are all synonymous,

//

---

[4] The Court has given evidence of this above. Steffens points, too, to the Court's description of this case to the jury at the outset: "In this lawsuit, Ms. Steffens claims that her employment was wrongfully terminated. She maintains that she was fired in retaliation because she reported to her managers that hourly employees, whom she supervised, were not receiving meal and rest breaks in violation of California law." (3/18/13 Tr. at 9:14–18.)

though, with what the Court did choose to say: "Defendant would not be liable for wrongful termination."

Regus argues that the Court's use of "valid" and "invalid" to describe motivating reasons for Steffens's termination was improper because the terms are not a proper legal standard and were undefined anyway. It is wrong on both counts. The court in *Davis*—which Regus cited, by the way, in arguing for a same decision instruction[5]—used "valid" and "invalid" to differentiate legally permissible grounds for a termination: "Similarly, where an employee has been discharged for both a valid reason (wrongful conduct) and an invalid reason (engaging in protected activity), the courts will not grant a remedy if the same decision would have been made for the valid reason." *Davis*, 152 Cal.App.4th at 1136. True, it defined them briefly in parentheticals, but Regus can't seriously insist that in context their meaning wasn't clear to the jury here. The Court said, "If you find that Plaintiff's reports about meal and/or rest breaks were a motivating reason for her termination, then the burden of proof shifts to Defendant to establish, also by a preponderance of evidence, that it would have made the same decision even if it had not taken into account the invalid motivating reason." The words "the invalid motivating reason" in that sentence are obviously a reference back to "Plaintiff's reports about meal and/or rest breaks." And because Steffens alleged no other improper basis for her termination—her retaliation for whistleblowing and age discrimination claims didn't make it to trial—a "valid" reason was obviously any reason other than her reports about meal and rest breaks. The Court didn't need to spell this out in any greater detail for the jury.

Up next is Regus's grievance that the Court deprived it of a "business judgment" instruction that would have explicitly told the jury it wasn't to judge the general wisdom or fairness of Steffens's termination.[6] In fact, Regus submitted a full-page instruction titled "At

---

[5] It was Regus that brought *Grant-Burton* and *Davis* to the Court's attention, both of which convinced it to give a same decision instruction. (Doc. No. 130 at 4.)

[6] The Court acknowledges that Regus submitted a "business judgment" instruction but it doesn't see in the transcript—nor does Regus cite in its motion for a new trial—where Regus actually argued for one at trial.

Will Employment and Business Judgment Rule," and the Court gave a modified portion of it: "In this case, Defendant employed Plaintiff 'at-will.' At-will employees may be terminated for any lawful reason, or for no reason at all. However, at-will employees may not be terminated for a reason that violates public policy, such as reporting violations of the law." (*See* Doc. No. 146 at 7; Doc. No. 144 at 12.) In the context of the entire instruction, this communicated exactly what a "business judgment" instruction would have communicated, namely that the jury was to find for Steffens only if it believed Regus terminated her because of her reports about meal and rest breaks and for no other reason. And counsel for Regus hammered this very point in closing argument, telling the jury, "Even if you disagree with how we conduct our business, if it has nothing to do with somebody complaining about a violation of law, then Mr. Stormer can sit up here all day and talk about profits and profits and profits." (3/21/13 Tr. at 211:8–11; *see also* 3/21/13 Tr. at 21–23 ("And because we may not agree with the decision, because we think, 'Well, it could have been done in a different way,' does not make it a public policy termination.").) Finally, Regus is right that courts have found reversible error in the refusal to give a "business judgment" instruction, even where an instruction about at-will employment was given, *see Veronese v. Lucasfilm Ltd.*, 212 Cal.App.4th 1, 20–24 (Cal. Ct. App. 2012), but the Court rejects the suggestion here that the totality of the instructions given didn't make plain for the jury that its only task was to determine whether Steffens's termination was unlawful, as opposed to wise, or mistaken, or cosmically unfair. Indeed, the court in *Veronese* reached its decision in part because the absence of a "business judgment" instruction wasn't mitigated by any other instruction, a finding that can't be made in this case.

Finally, Regus objects that the verdict form didn't have a "same defense" question—that is, it didn't ask the jury specifically whether Regus would have terminated Steffens anyway for some reason unrelated to her alleged reports about meal and rest breaks. Again, because the actual claim instruction contained a "same defense" instruction, there was no need to ask a "same defense" question on the verdict form itself. The jury well knew that if it found Regus would have fired Steffens anyway for reasons having nothing to

do with reports about meal and rest breaks, her termination could not have been a wrongful

one in violation of public policy. *See Mateyko*, 924 F.2d at 827.

Regus's motion for a new trial based on the Court's "same defense" instruction is

**DENIED**.

### G.    Punitive Damages

The Court bifurcated the punitive damages phase of this case. (Doc. No. 123 at 2.)

During the liability phase, before it began to deliberate, the jury was instructed simply on the

factual predicate to a punitive damages award:

> If you find for the Plaintiff and award damages, you must further determine whether Defendant acted with malice, oppression, or fraud. Plaintiff must prove malice, oppression, or fraud by clear and convincing evidence, which means that you must find it is 'highly probable' that Defendant acted in this way.
>
> Conduct is 'malicious' if it is accompanied by ill will or spite, or if it intended to injure someone. Conduct is 'oppressive' if it injures or damages or otherwise violates someone's rights with unnecessary harshness or severity, such as the misuse or abuse of authority or power or by taking advantage of someone's weakness, disability, or misfortune. And finally, conduct is 'fraudulent' if it intentionally misrepresents or conceals material facts with the intent to harm. (Doc. No. 144 at 17.)

The verdict form, following up on this instruction, asked, "In terminating Plaintiff, did

Defendant, as proved by clear and convincing evidence, act with malice, oppression, or

fraud? Yes or no?" (Doc. No. 143 at 1; *see also* 3/21/13 Tr. at 173:16–174:25.) After the

jury returned its verdict answering that question in the affirmative, the Court gave a more

detailed, supplemental instruction on punitive damages:

> The purpose of punitive damages are to punish a defendant and to deter similar acts in the future. Punitive damages may not be awarded to compensate a plaintiff.
>
> The plaintiff has the burden of proving by clear and convincing evidence that punitive damages should be awarded, and if so, the amount of any such damages.
>
> If you find that punitive damages are appropriate, you must use reason in setting the amount. Punitive damages, if any, should be in an amount sufficient to fulfill their purposes but should not reflect bias, prejudice, or sympathy toward any party. In considering the amount of any punitive damages, consider the degree of reprehensibility of the defendant's conduct, including

whether the conduct that harmed the plaintiff was particularly reprehensible because it also caused actual harm or posed a substantial risk of harm to people who are not parties to this case. You may not, however, set the amount of any punitive damages in order to punish the defendant for harm to anyone other than the plaintiff in this case.

In addition, you may consider the relationship of any award of punitive damages to any actual harm inflicted on the plaintiff. (Doc. No. 144 at 21–22; *see also* 3/22/13 Tr. at 3:18–5:25.)

Regus now raises three problems with these instructions.

First, Regus says, the Court's definitions of malice and oppression were wrong; it used Ninth Circuit Model Jury Instruction 5.5 rather than CACI 3946. This matters because, according to Regus, the Ninth Circuit definitions are easier to meet. For example, while both instructions say conduct is malicious if it's intended to cause injury, the Ninth Circuit instruction says it's *also* malicious if it's accompanied by "ill will or spite" whereas the California instruction says it's *also* malicious if was "despicable and was done with a willful and knowing disregard of the rights or safety of another."[7] Likewise, while the Court defined conduct as oppressive if it "injures or damages or otherwise violates someone's rights with unnecessary harshness or severity," the California instruction defines it as conduct that "was despicable and subjected the plaintiff to cruel and unjust hardship in knowing disregard of her rights." Regus's second complaint is that the Court didn't instruct the jury that the acts constituting malice or oppression had to have been committed by a Regus officer, director, or managing agent.[8] And third, Regus criticizes the Court for not instructing the jury to consider Regus's financial condition in settling on a punitive damages amount (and not

---

[7] The emphasis on also here is important. Both instructions are given in the disjunctive, meaning conduct is malicious if it was intended to injure *or*, under the Ninth Circuit instruction if it was accompanied by ill will or spite and under the California instruction if it was despicable and done with a knowing disregard for another's rights or safety.

[8] Actually, CACI 3946 doesn't require that the malicious or oppressive acts be *committed* by an officer, director, or managing agent. It is also sufficient under the instruction if an officer, director, or managing agent *authorized* the acts, or knew about them and subsequently *adopted or approved* them.

allowing for new evidence on this matter), as required by CACI 3949.[9]  To be clear, the first and second complaints are directed at the first punitive damages instruction, while the third claim is directed at the supplemental instruction.

As a threshold matter, the Court questions whether Regus ever specifically objected to the instructions at trial.  It's true that Regus's proposed instructions, particularly Q and R, contained the language it now argues the Court erred by not using, and Regus noted its objections to Steffens's proposed instructions on copies submitted to chambers.  (*See* Doc. No. 146 at 16–19.)  But when the time first arrived to discuss the instructions in open court, Regus really said nothing more than, feebly, that it had submitted instructions of its own that the Court wasn't using.  (*See* 3/20/13 Tr. at 263:17–265:4.)  It certainly did not say, clearly and on the record, that the Court had to give the CACI instructions verbatim as a matter of law[10], nor did it attempt to explain any specific objections to using the Ninth Circuit instructions.  The following day, during another instructions conference, Regus was similarly shy.  (*See* 3/21/13 Tr. at 114:1–120:6.)  Before a noon recess, the Court gave the parties a final set of proposed jury instructions and said, "If you can look over those.  And if you have any other changes, note those, and I'll take formal objections to the instructions or refusal to give other instructions when we come back."  (3/21/13 Tr. at 116:19–22.)  After the break, when the Court informed the parties it had changed the punitive damages instruction, pursuant to Regus's request, to require Steffens's to prove malice, oppression, or fraud by clear and convincing evidence, it said, "So I think with these changes, I'm happy to hear from you any additional requests or objections that you have, but I would consider

---

[9] CACI 3949 instructs a jury to consider each of three factors, separately, in determining the amount of punitive damages.  The third is "In view of that defendant's financial condition, what amount is necessary to punish the defendant and discourage future wrongful conduct?"  *See also Adams v. Murakami*, 54 Cal.3d 105, 109 (Cal. 1991) ("Our prior decisions, constitutional considerations, and the importance of appellate review indicate that an award of punitive damages cannot be sustained on appeal unless the trial court record contains meaningful evidence of the defendant's financial condition.").

[10] Regus cites two cases for this proposition, both from the Tenth Circuit: *Alley v. Gubser Dev. Co.*, 785 F.2d 849 (10th Cir. 1986) and *Miller v. Cudahy Co.*, 858 F.2d 1449 (10th Cir. 1988).  *Alley* actually doesn't make the point explicitly; it simply acknowledges that in Colorado exemplary damages are a creature of statute and then follows Colorado law.  *Alley*, 785 F.2d at 855.  *Miller* is a bit more firm: "In a diversity case, the circumstances under which punitive damages are available are governed by state law, as are the substantive elements upon which such an award may be based."  *Miller*, 858 F.2d at 1457.

this a settled set subject to taking your final comments." (3/21/13 Tr. at 119:14–17.) Regus's only response was, "There were a number of instructions that we proposed that you did not give. I was just going to file a pleading defendant proposed instructions not given by the Court." The Court said "That's fine" and then explained "The reason I'm not giving any that are not in this packet is I find that they're subsumed and the principles are already covered by existing pattern instructions, or alternatively, I find that they include elements that are not elements." Regus's response was "Thank you." (3/21/13 Tr. at 119:14–120:6.)

The Court should be clear here and say that the above applies only to the first punitive damages instruction. The second punitive damages instruction was drafted and presented to the parties after the jury notified the Court that it had reached a verdict but before the verdict was read—basically, during the down time that the Court contacted counsel and told them to return to the courtroom, and readied itself for the verdict. That said, Regus still made no specific objection to the second punitive damages instruction on the record once court had been reconvened. Counsel for Steffens, Cindy Panuco, has submitted a declaration with her recollection of this quasi-conference on the second punitive damages instruction, and it is not inconsistent with the Court's own. At the time that jury reported it had reached a verdict, the Court had not prepared a follow-up instruction for determining the amount of punitive damages. The law clerk did that relatively quickly, because it was the Court's announced intent, assuming the jury did find that Regus terminated Steffens with malice or oppression, to immediately give the second punitive damages instruction and move into a second phase of arguments. Regus did not specifically object that the Court was using a Ninth Circuit rather than CACI instruction, nor did it object to the protocol of moving straight into further argument without putting on additional evidence of Regus's net worth or financial condition. Nor, finally, did Regus object on the record when the jury returned a verdict for Steffens and the Court explained, "I have another instruction, and there is a final phase of the trial that I think at least the presentations will involve no presentation of evidence, just some further argument." (3/22/13 Tr. at 3:20–23.)

//

The general rule is that objections to jury instructions must be made "on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). A limited exception arises "where the district court is aware of a party's concerns and further objection would be unavailing." *Medtronic, Inc. v. White*, 526 F.3d 487, 495 (9th Cir. 2008) (citation omitted). More specifically, the exception is available when (1) throughout the trial the party argued the disputed matter with the court, (2) it is clear from the record that the court knew the party's grounds for disagreement with the instruction, and (3) the party offered an alternative instruction." *Id.* (internal quotations and citation omitted). These rules are a problem for Regus here. First, Regus never raised at trial, specifically and on the record, the objections it raises now. The most it argued was that some of its instructions weren't given, which in and of itself is completely unremarkable; the Court *never* gives every instruction a party asks for, but rather does its best to reconcile the parties' proposed instructions into a concise and workable set for the jury. Second, Regus can't benefit from the exception to the general rule because its present objections weren't argued throughout the trial (in fact, they weren't argued at all), nor is it at all clear from the record that the Court understood exactly what Regus's problems with the punitive damages instruction were. The Court finds that Regus's objections to the punitive damages instruction were waived at trial, and it therefore **DENIES** the motion for a new trial on this ground.

Even assuming the Court were to allow Regus's objections now, it would still find them to be substantively weak and the Court's alleged errors insufficiently prejudicial to warrant a new trial. *See Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007) ("[W]e shall reverse when the instructions misstate the law or fail to convey the relevant legal principles in full *and when those shortcomings confuse or mislead the jury and prejudice the objecting litigant*." (internal quotations and citations omitted) (emphasis added); *Reed v. Hoy*, 909 F.2d 324, 326 (9th Cir. 1989) ("We review jury instructions to determine whether, taken as a whole, they mislead the jury or state the law incorrectly to the prejudice of the objecting party."); *Nava v. Seadler*, 2011 WL 6936341 at *3 (N.D. Cal. Dec. 30, 2011) ("Even assuming that //

the jury instruction as given was incomplete and therefore incorrect, the court finds that a new trial is not warranted because the error was more probably than not harmless.").

First, the difference between the Ninth Circuit instruction's definitions of "malice" and "oppression" and California's definition of those terms is so nuanced, and so much a matter of semantics, that it is largely imaginary. Second, on the matter of a "managing agent" instruction, CACI 3946 requires that the conduct at issue was committed by, authorized by, or adopted and approved after the fact by, "one or more officers, directors, or managing agents." Steffens's claim at trial, for which she put on evidence, was that Golgart, at the time Regus's regional vice president for the west and Canada (*see* 3/20/13 Tr. at 129:8–9), orchestrated her termination in retaliation for her reports about meal and rest breaks. On any definition of "officer" or "managing agent," Golgart was one. Even a case that *Regus* relies on, as Steffens points out, supports this. *See White v. Ultramar, Inc.*, 21 Cal.4th 563 (1999). The court in *White* recognized that "the Legislature intended that principal liability for punitive damages not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy." *Id*. at 577. It then found that a zone manager of eight convenience stores and 65 employees, to whom other store managers reported, who reported to corporate management, and who herself fired the plaintiff met the definition of a managing agent. *Id.* at 577. It's hard to see how, following *White*, Golgart could not be considered a managing agent.

Finally, with respect to Regus's net worth and financial condition, the jury did hear evidence as Steffens notes. For example, Golgart testified that before the October 2006 meeting the Regus's Emerald Plaza center had revenues of about $230,000 a month. (3/20/13 Tr. at 166:3–8.) The jury heard that Emerald Plaza was just one of seven centers in San Diego alone, and one of fifty-seven centers in California. (3/20/13 Tr. at 140:16–21.) The irony of this argument, of course, is that *Regus* filed a motion in limine to exclude evidence of its financial condition at trial, which the Court granted. (*See* Doc. Nos. 86, 123 at 2.) While the Court did say that financial records would be admissible in the punitive

damages phase of this case, Regus never requested or affirmatively argued this as much as it reluctantly conceded that the information would be relevant if the jury found for Steffens on the liability question. (*See* Doc. Nos. 123 at 2.) This makes perfect sense, too, because Regus admits it is "a large, international company," and the clear spirit of its motion in limine regarding its financial condition is that the information could only prejudice Regus at trial. (Doc. No. 86 at 3.) While Regus seizes now on the fact that the jury didn't hear evidence of its finances, it certainly doesn't argue that if the jury had received evidence of its finances the punitive damages award would have been less.

## III.    Evidentiary Rulings

Moving on from allegedly erroneous jury instructions, Regus believes that a number of the Court's evidentiary rulings were so erroneous as to have cost it this case. "A new trial is only warranted when an erroneous evidentiary ruling substantially prejudiced a party." *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (internal quotations and citation omitted).

### A.    Evidence of Meal and Rest Breaks

To rebut the element of Steffens's wrongful termination claim that she had some reasonable and good faith belief that Regus wasn't providing employees with meal and rest breaks, Regus tried to introduce at trial the results of an internal audit it conducted after learning Steffens was pursuing a lawsuit. According to Regus, the audit confirmed that no hourly employees missed their breaks at the Emerald Plaza center, and this would have both diminished Steffens's credibility, and, just as important, showed that her report of meal and rest breaks had no reasonable or good faith basis. Steffens objected, and the Court sustained the objection. Initially, the stated basis for excluding the evidence was simple relevance: Regus wasn't being accused in this case of not providing meal and rest breaks to employees, but of firing an employee for alleging as much. (*See* 3/21/13 Tr. at 143:21–145:10; 146:2–8.) But during a subsequent sidebar, when Regus made clear that it wanted to show Steffens had no reason to make the allegation, the Court added that the audit was hearsay and Regus had no rebuttal to that:

Court: I'm not going to allow it.  We're conducting our own investigation.  The only thing is hearsay.  She didn't catch the hearsay.

Mr. Carothers: She did.

Court: How can she competently testify whether these breaks would be given when she wasn't there?  You have to reconstruct it.  People told me they were getting their breaks or they weren't.  I'm not going to permit it.  That's what this is about.  (3/21/13 Tr. at 157:21–158:4.)

Regus now argues that this was reversible error.

The counterpoint to Regus's argument is that it was *never* Regus's defense to Steffens's claim that she had no reasonable or good faith basis for believing employees weren't being provided meal and rest breaks.  Had that been Regus's defense, presumably the trial would have gone very differently.  Regus would have essentially conceded that Steffens reported meal and rest break violations, but it then would have argued that these reports were a baseless deflection of her responsibility for running the Emerald Plaza center to its satisfaction and therefore an adequate ground for her termination.  That wasn't Regus's theory of the case.  Instead, Regus, through Golgart's testimony, argued that Steffens never reported meal and rest break violations in the first place:

Q: During this meeting while you — the three of you are in Denise Steffens's office before you go to the luncheon down the hall, did Ms. Steffens say anything about wage and hour violations?

A: No.

Q: Did she say anything — did Ms. Steffens say anything during this meeting about Regus violating California law by not giving the hourly employees meal and rest breaks?

A: No.

Q: Did she read some legal language or quote some legal language during the meeting about California law concerning meal and rest breaks?

A: Did she read?

Q: Or did she recite?

A: No.

- 27 -

> Q: Did she specifically say that her team members, the CSR's or the hourly employees, weren't getting meal and rest breaks?
>
> A: No. (3/20/13 Tr. at 187:22–188:14.)

Indeed, when Golgart first took the stand and counsel for Regus asked him up front if he fired Denise Steffens because she reported that Regus was violating the law, he said "No." (3/20/13 Tr. at 130:6–8.) So, to the extent Regus criticizes the Court for not letting the internal audit in, it is trying to present a different case now than it presented at trial.

Looking past this, Steffens's good faith was still an element of her wrongful termination claim, and whether Regus actually provided meal and rest breaks to employees is somewhat relevant to that element. It may not be a determinative fact, and probing it does risk a kind of mini-trial on a peripheral issue, but it may nonetheless have been a fair rebuttal to Steffens's claim that she sincerely believed meal and rest breaks weren't being provided to provide proof that they were. Even when evidence is relevant, though, it must also be competent. Here, Regus proposed to introduce the evidence through a witness, Sharon Edmondson, a Regus human resources vice president based in Dallas, Texas who received the results of a third-party audit *after* Regus got sued. The third party auditors purportedly had spoken with Regus employees in San Diego, although Regus has never been clear on this point. What is clear is that statements made to the auditors, as well as testimony from Edmondson about what the audit revealed, would have plainly been hearsay. Nothing precluded Regus from calling witnesses from the San Diego center who had personal knowledge, for example hourly employees who could have testified that they were never denied a meal or rest break, if that were true. Regus didn't do that.

At the time the Court raised the hearsay problem with the audit, Regus had no answer, but it now says "the Court did not give Regus the opportunity to present testimony to establish that the audit was a business record or qualified under any other hearsay exception." (Doc. No. 153 at 19 n.9.) The Court presumes that if Regus really had some other plausible hearsay exception in mind it would simply have given it and not given the point a footnote's attention. The business records exception can't get the job done, though.

It's available where the record is "(1) made or based on information transmitted by a person with knowledge at or near the time of the transaction; (2) made in the ordinary course of business; and (3) trustworthy, with neither the source of information nor method or circumstances of preparation indicating a lack of trustworthiness." *S.E.C. v. Jasper*, 678 F.3d 1116, 1122 n.2 (9th Cir. 2012). The audit fails (1) and (2), and perhaps even (3). *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir. 1984) ("A document prepared for purposes of litigation is not a business record because it is lacking in trustworthiness. This is because where the only function that the report serves is to assist in litigation or its preparation, many of the normal checks upon the accuracy of business records are not operative.") (international quotations marks and citation omitted). Regus's request for a new trial based on the Court's unwillingness to allow testimony about the audit is **DENIED**.

### B.    Edmondson's Notes

During trial Regus tried to introduce actual notes Edmondson took during a June 2007 phone call with Steffens in which she wrote that Steffens was "not engaged" in her job at the Emerald Plaza center. (*See* 3/21/13 Tr. at 140:14–141:10; Doc. No. 148 at 10.) Regus wanted not only to rebut Steffens's charge that she was a strong performer, but to show that this defense wasn't concocted after she was fired and it found itself the recipient of a lawsuit. The Court sustained an objection to the admission on Edmondson's notes on the ground they were hearsay, and when counsel for Regus maintained they were a business record the Court disagreed. (*See* 3/21/13 Tr. at 126:20–127:4.) Now, Regus renews its argument that the notes are a business record under Federal Rule of Evidence 803(6), and adds that they  were the non-hearsay statement of a party-opponent under Rule 801(d)(2) and a present sense impression under Rule 803(1).

Notes from a telephone conversation, to be fair, *may* satisfy the business records exception to the hearsay rule. *See, e.g.*, *U.S. v. Kingston*, 971 F.2d 481, 486 (10th Cir. 1992). But notes may also *not* satisfy the exception, particularly where "the source of information [ ]or the method or circumstance of preparation indicate a lack of

trustworthiness." they also may not. Fed. R. Ev. 803(6); *see also In re Cirrus Logic Securities Litig.*, 946 F.Supp. 1446, 1469 (N.D. Cal. 1996). The Court finds that here with respect to Edmonson's impression of Steffens's engagement—an impression recorded over the telephone after Steffens had been put on an improvement plan and allegedly after Regus made the decision to fire her. When the Court denied that the notes were a business record at trial, Regus had no rebuttal. (3/21/13 Tr. at 127:1–4.) Now, in its motion for a new trial, Regus still has no rebuttal; it just asserts in a conclusory fashion that the business records exception applies. (Doc. No. 153 at 29.)

Regus's argument that the notes were a statement of a party-opponent under Rule 801(d)(2) is perplexing. Regus is challenging the refusal to admit the notes of Edmondson, its own witness, to the effect that Steffens was "not engaged." But those aren't the statements of a party-*opponent.* The non-hearsay rule covers statements offered against an opposing party that were made by that opposing party, and therefore wouldn't cover Edmondson's own statements about Steffens's lack of engagement here.

The notes also aren't a present sense impression—an argument Regus makes here for the first time and has therefore likely waived. *See* Fed. R. Ev. 103(a)(2). As with the business records exception to the hearsay rule, notes from a conversation or meeting *may* satisfy the present sense impression exception. *See U.S. v. Perl*, 492 Fed.Appx. 37, 40 (11th Cir. 2012); *Tracinda Corp. v. DaimlerChrysler AG*, 362 F.Supp.2d 487, 502 (D. Del. 2005); *U.S. v. Ferber*, 966 F.Supp. 90, 97 (D. Mass. 1997). They also might not. *See Cody v. Harris*, 2004 WL 1254129 at *3 (N.D. Ill. June 8, 2004); *Newark Group, Inc. v. Sauter*, 2004 WL 5623944 at *6 (S.D. Ohio Mar. 26, 2004); *Cirrus Logic*, 946 F.Supp. at 1469. *Cirrus Logic* may be the most relevant of all of these cases. The court in that case held that notes taken by a stock analyst during a call with company executives were the analyst's own interpretations and analyses of those conversations, and therefore constituted "subjective input in clear violation of the theory underlying Rule 803(1)." *Id.* Something similar could be said of Edmondson's note that Steffens was "not engaged." The present sense impression exception limits the subject matter of the hearsay to a description or explanation of an event

08cv1494

or condition, and it must be made with little chance for reflection.  *See* Fed. R. Ev. 803(1);

*Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995).  Regus doesn't do anything other

than assert the present sense impression exception here, so the Court has no understanding

of what its actual argument is, but it would stand by its initial ruling.  If that ruling was

mistaken, the Court would still find that Regus waived the argument at trial *and* that there is

no prejudice from the exclusion considering that Edmondson testified about what her notes

said, and all the actual notes would have done is establish that she was not lying.  Regus's

motion for a new trial is therefore **DENIED**.

### C.    Financial Documents

Regus criticizes the Court for not allowing it to present financial documents that, it

says, would have shown the Emerald Plaza center was not performing well under Steffens's

leadership.  (*See* Doc. No. 148 at 14–17.)  Counsel for Steffens represented that the

documents were given to him that morning (of the third day of trial) for the first time, that they

were printed out the night before, and that the data was formatted and even calculated

differently than in previous disclosures he'd received.  Regus conceded all but the final point,

and the Court refused to allow Regus to present the documents.  (3/20/13 Tr. at

100:12–102:18.)  Now, for the first time, Regus argues that the documents were business

records and impeachment evidence, and that the Court's exclusion of them was prejudicial

because it resulted in the evidence being one-sided—none of which, of course, overcome

the fact the Regus presented the documents to Steffens on the morning of trial.

But even if the Court overlooks the timeliness of the disclosures, Regus's reasons for

allowing them come up short.  First, calling them business records presumes there was

some sort of hearsay objection to their use, which there was not, and also overlooks that

they were generated for the purposes of litigation, which disqualifies them as business

records in the first place.  *See Millenkamp v. Davisco Foods Int'l Inc.*, 562 F.3d 971, 980 (9th

Cir. 2009).  Second, impeachment evidence is evidence that goes to a witness's credibility

or potential bias.  Here, Steffens and Jones testified that the Emerald Plaza center was

doing well; Regus may have had financial documents suggesting the opposite, but those

- 31 -

documents would just be Regus's side of the story; they wouldn't be introduced to show that Steffens and Jones can't be trusted on the witness stand. Third, Regus can't seriously argue that without the documents it suffered a "complete absence" of documentation to make its case, as in the case it cites, *Phoenix Assoc. III v. Stone*, 60 F.3d 95, 105 (2d Cir. 1995). In fact, Regus itself cites to Golgart's testimony where various financial documents were discussed and the jury heard Regus's account of how the Emerald Plaza center was truly performing when Steffens was employed to manage it. (*See* 3/20/13 Tr. at 231:7–235:21; *see also* Doc. No. 156-4 at 35, 65–75.) Regus's motion for a new trial because of the exclusion of the financial documents is **DENIED**.

## IV. Weight of the Evidence

Moving on from the Court's alleged errors, Regus next focuses its attention on the evidence presented at trial and tries to argue that it can't possibly support the jury's verdict. Obviously, this is a strenuous argument to make considering the legal standard. "A motion for a new trial [based on insufficiency of the evidence] may be granted . . . only if the verdict is against the great weight of the evidence or it is quite clear that the jury has reached a seriously erroneous result." *Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir. 1987).

In a way, it's worth noting, the Ninth Circuit's own remand order in this case forecloses Regus's argument that the verdict can't stand on the evidence presented. The Ninth Circuit recognized that: (1) Steffens was a longstanding employee of HQ and Regus who consistently received positive reviews; (2) Steffens and Jones testified that when she brought up meal and rest breaks during the October 2006 meeting Golgart was immediately and awkwardly silent; (3) Jones testified that Golgart directed him to get rid of Steffens after the October meeting because of her meal and rest break report and that they put together an aggressive improvement plan with this purpose in mind. Based on this evidence, the Ninth Circuit said, "we conclude that Steffens presented sufficient evidence of pretext to create a genuine issue of material fact as to the real reason for her termination." *Steffens v. Regus Group, PLC*, 485 Fed. Appx. 187, 189 (9th Cir. 2012). This same evidence that the Ninth Circuit said warranted a trial was established at trial, and while Regus tried to rebut

it, it is perfectly comprehensible that the jury simply believed Steffens's and Jones's story more than Regus's.

### A. Evidence of Retaliation

Regus begins by claiming there was no evidence that Steffens was terminated in actual retaliation for her report about meal and rest breaks in the October 2006 meeting. What Regus really means, though, is that there was no "smoking gun," which of course there doesn't need to be. But the Court disagrees with Regus's characterization of the evidence: there was a smoking gun in this case. The jury heard testimony from both Steffens and Jones that Steffens brought up meal and rest breaks during the October 2006 meeting and that Golgart abruptly grew silent. (3/19/13 Tr. at 54:19–56:3; 196:20–198:7.) Jones further testified that the moment the meeting ended and Steffens had left, Golgart said they needed to get rid of her. (3/19/13 Tr. at 200:8–2-1:5.) This testimony, if believed (as it obviously was), amounted to a smoking gun that Steffens was terminated for reporting her belief that Regus was violating California law. The jury also heard evidence that the performance improvement plan Steffens was subsequently placed on was both formulaic and virtually unattainable; Jones even testified that "i[t] was not a plan for improvement, but to have her fired." (3/19/13 Tr. at 220:6–7.) Golgart and Edmondson had to concede, in relatively plain terms, that the plan was unrealistic to accomplish in its entirety. (3/21/13 Tr. at 75:16–76:15, 146:13–146:24. ) On top of all of this, Steffens presented evidence that she'd received only positive performance reviews while employed at the Emerald Plaza center, which Steffens cites to in her opposition brief. (Doc. No. 156 at 35–37.) Regus tried to argue during trial that Golgart simply wasn't impressed with Steffens during the October 2006 meeting, thought she lacked drive, and thought the center could benefit from new leadership. But it was certainly the jury's prerogative to accept the direct and circumstantial evidence Steffens presented and believe the story she was telling, namely that she was fired for making a report about meal and rest breaks. The Court can't toss that verdict simply because it's not the only reasonable interpretation of the evidence.

//

08cv1494

**B.    Steffens's Reasonable and Good Faith Belief**

There's no dispute that Steffens's wrongful termination claim required her only to prove she had a reasonable and good faith belief that employees at the Emerald Plaza center weren't getting their meal and rest breaks. She did *not* need to prove this to actually be true. Regus argues, however, that Steffens offered no evidence to prove even the former, lesser point. Regus argues, "There was no other evidence from which the jury could have inferred that Steffens had a reasonable and good faith belief that Regus was violating the law. Hence, there was no testimony presented by Plaintiff that showed her statement had any reasonable or good faith basis in fact." (Doc. No. 153 at 26.)

Regus overlooks Steffens's own testimony, though, which the jury was entitled to accept as sincere, truthful, and therefore indicative of a reasonable and good faith belief. She testified that during 2005 and 2006, the issue of meal and rest breaks had become important to her, that she found there was no formal policy laid out in the employee handbook, that her center was understaffed, and that she had raised the issue with her supervisors prior to the October 2006 meeting with Golgart. (3/19/13 Tr. at 33:9--36:21.) Then, there was the October 2006 meeting itself, during which Steffens reported that the Emerald Plaza center was understaffed—she even spoke to specific reductions in the workforce there—and that employees weren't getting their meal and rest breaks. (3/19/13 Tr. at 54:11–55:11.) Regus is apparently of the mind that Steffens needed to present some independent, corroborating evidence of meal and rest break violations in order to prove her allegations of such were reasonable and made in good faith. The Court disagrees—although the "staffing model" discussed by Regus in its brief would be such evidence. (*See* Doc. No. 156 at 27.) The jury was entitled to infer from Steffens's own testimony, and from her and Jones's description of the October 2006 meeting, that she lodged a non-frivolous complaint and meal and rest break violations at the Emerald Plaza center—a complaint, that is, that was made in reasonably and in good faith based on her observations at the center. The jury's verdict was not against the clear weight of the evidence, and Regus's motion for a new trial is **DENIED**.

### C. Emotional Distress Damages

Regus argues that the evidence didn't support the jury's emotional distress damages award of $850,000. It cites *Mockler v. County of Orange*, 157 Cal.App.4th 121 (Cal. Ct. App. 2007), a whistleblower retaliation and sexually-based hostile work environment case, in which the court found that a non-economic damages award of $1,681,823 was excessive. The Court of Appeal in *Mockler* affirmed the trial court's granting of a new trial on damages, quoting its reasoning at length:

> After weighing this entire record, including reasonable inferences, the Court finds that as to the County of Orange only, (1) there were no damages due for the harassment, (2) no physical pain and suffering, requiring medical or professional attention, (3) no evidence as to loss of reputation, (4) no evidence plaintiff had trouble finding a new job, (5) no evidence the public scorned plaintiff, (6) no evidence of any future damages or injury. Therefore, the non-economic damages herein in the amount of $1.6 million were excessive. Although the jury may not have intended to 'punish' the County, that is what such an inflated award represents. The Court therefore exercises its duty to set aside the verdict pursuant to its independent appraisal of the evidence. The motion is granted unless the plaintiff agrees to accept $125,000. *Id.* at 147.

As Regus sees it, if a new trial on damages was warranted in *Mockler* a new trial is warranted here.

The Court disagrees. There was plenty of testimony from Steffens, some of it corroborated by her friend Linda Reid, that from the October 2006 meeting on through her termination and relocation to Wichita Steffens suffered intense emotional distress. Some of that related to on-the-job pressures, and some of it related to the emotional hit in leaving San Diego, amassing credit card debt, declaring bankruptcy, and moving home with her family. (*See, e.g.*, 3/19/13 Tr. at 68:8–71:14, 72:7–75:16; 3/20/13 Tr. at 116:3–22.) There was a dispute at trial, of course, as to how much of Steffens's financial troubles were attributable to her termination versus a general economic downturn, but the jury was entitled to credit Steffens's testimony and evidence that the termination marked a horrific turning point in her life. The Court therefore disagrees that the evidence doesn't support the jury's non-economic damages award, and it **DENIES** Regus's motion for a new trial on this basis.

## D. Evidence for Punitive Damages Award

Having argued that the evidence was insufficient for the compensatory and non-economic damages the jury awarded, Regus last argues that the evidence doesn't support the jury's punitive damages award of $3.5 million. It makes three points here. First, Regus didn't act maliciously. Second, the award has no potential to deter similar conduct in the future. And third, Steffens elicited no evidence, and the jury saw no evidence, of Regus's financial condition.

Regus's assertion that it didn't act maliciously falls very flat. To start with, it claims there was no evidence that hourly employees as Emerald Plaza were actually missing their meal and rest breaks, which of course has nothing to do, really, with the merits of Steffens's claim and therefore nothing to do with whether punitive damages are appropriate. Regus also claims there was no evidence that Steffens was terminated because of her comments about meal and rest breaks during the October 2006 meeting, which the Court has addressed above. To the contrary, there was evidence from which the jury could infer that Steffens was terminated precisely because of her comments about meal and rest breaks, which is to say maliciously.

The assertion that the punitive damages award has no potential to deter similar conduct going forward falls even flatter. Here, Regus tries to argue that Shannon Jones, who was the only Regus employee to relate Steffens's termination to her comment about meal and rest breaks, is no longer with the company and therefore there's no deterrence work to be done. This completely misunderstands the nature of Steffens's claim and the likely reasoning behind the jury's verdict. Steffens argued at trial that it was really *Golgart* who essentially ordered Steffens terminated for complaining about employees not being given meal and rest breaks—and Regus itself that let him get away with it. If Golgart were no longer employed by Regus, or if Regus no longer existed, *maybe* this would argument would have a bit more traction. But it has none now. A $3.5 million award is a sit-up-and-take-notice amount, and surely it's plausible that such an award will impact the manner in which Golgart and Regus handle accusations of labor law violations going forward.

08cv1494

The Court has already addressed Regus's contention that evidence of its financial condition was wrongfully excluded. The same analysis applies here, and the Court finds that there was certainly an adequate evidentiary basis for the punitive damages award. The jury may not have received an extended tutorial on Regus's accounting books, but it was made aware of the scale of Regus's operations, and even made aware of Regus's revenue stream at Emerald Plaza in 2006 and 2007. (3/20/13 Tr. at 203:15–206:6.) The Ninth Circuit has even recognized that *some* evidence of a defendant's financial condition will do, and that there's no precise data set that has to be brought to the jury's attention. *See Freund v. Nycomed Amersham*, 347 F.3d 752, 763–64 (9th Cir. 2003). It bears repeating, finally, that Regus failed to object when the Court went straight into the punitive damages arguments without additional evidence, as indicated above. The motion for a new trial is **DENIED**.

## V.    Excessive Damages

In addition to arguing that the evidence presented at trial didn't support the jury's non-economic and punitive damages award, Regus also argues that the damages were excessive based on the evidence. It's not entirely clear how these arguments differ, but the Court presumes that while Regus *just* argued that the damages should be rejected outright by the Court, it is *now* arguing that the Court should at least reduce them. It cites *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983) ("When the court, after viewing the evidence concerning damages in a light most favorable to the prevailing party, determines that the damages award is excessive, it has two alternatives. It may grant defendant's motion for a new trial or deny the motion conditional upon the prevailing party accepting a remittitur.").[11]

The Court can reverse a jury's damages award "if the amount is grossly excessive or monstrous." *Lambert v. Ackerly*, 180 F.3d 997, 1011 (9th Cir. 1999). There's no doubt that

//

---

[11] Regus opens its argument, probably correctly, by asserting that whether a jury verdict is excessive is a question of state law. But it then cites *Fenner*, a Ninth Circuit case, and in discussing the non-economic damages award it relies on Fourth Circuit cases. In any event, the Court doubts that anything turns here on where the legal standard comes from.

the jury award in this case was high, but the Court is unwilling to call it "grossly excessive" or "monstrous," and therefore unwilling to throw out the award or reduce it accordingly.

## A. Emotional Distress Damages

Citing two Fourth Circuit cases, Regus argues that Steffens's claims of emotional distress rested too heavily on conclusory statements—and too little on demonstrable injuries—to justify a, $850,000 award. *See Sloane v. Equifax Info. Sys.*, 510 F.3d 495 (4th Cir. 2007); *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996). Indeed, the Fourth Circuit in *Sloane* recognized that emotional distress is "easily susceptible to fictitious and trivial claims," and it emphasized the need for plaintiff testimony that "sufficiently articulate true emotional distress" over testimony that "amounts only to conclusory statements." *Sloane*, 510 F.3d at 503. Likewise, the Fourth Circuit in *Price*, discussing a Seventh Circuit case, emphasized the need for demonstrable evidence or objective manifestations of emotional distress, over and above a plaintiff's mere assertions of emotional distress. *Price*, 93 F.3d at 1252. Drawing on *Sloane* and *Price*, Regus argues that Steffens's offered only conclusory statements that she was distraught by her termination, and that any objective evidence cuts the other way: (1) she found a job three months after she was fired; (2) she suffered no medical or reputational harms; (3) she didn't lose any friends or sleep; and (4) her salary would have been cut anyway had she stayed with Regus.

As Steffens points out, however, the law on which Regus relies has been expressly disavowed by the Ninth Circuit. And in terms that could not be any more clear: "The holding of Price that 'the evidence of the emotional distress must be demonstrable, genuine, and adequately explained' is not the law of this Circuit." *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003). *See also Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000) ("While objective evidence requirements may exist in other circuits, such a requirement is not imposed by case law in . . . the Ninth Circuit, or the Supreme Court."); *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994) (""[C]ompensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances, whether or not plaintiffs submit

- 38 -

evidence of economic loss or mental or physical symptoms."). The Ninth Circuit in Zhang upheld an emotional distress award in an employment discrimination case based solely on a plaintiff's testimony that his termination killed his dream of working in America and impacted his dignity and reputation. "[T]he jury obviously could have gleaned that he was greatly hurt and humiliated by his termination and the manner in which it was carried out," the Court said, and this Court would say the same here. *Zhang*, 339 F.2d at 1041.

*Even if* the Court were to import the law of *Price* and *Sloane* here, it would still find, for the reasons given above, that the emotional distress award was not so excessive that it must be either thrown out or a remittitur ordered. Regus's motion for either is **DENIED**.

## B. Punitive Damages

Relying on constitutional limits the Supreme Court has set on punitive damages awards, Regus argues that the jury's award in this case was so high that it violates due process. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003); *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). The legal standard isn't in dispute. Courts must consider "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418. Of these factors, the most important is the first. *Id.* at 419.

### 1. Reprehensibility

The reprehensibility inquiry asks whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* Naturally, Regus argues that these factors cut in its favor, and Steffens argues the opposite.

First, the Court disagrees with Regus's argument that Steffens's termination was a purely economic harm, analogous to State Farm's misconduct in the insurance dispute at

issue in *State Farm*, just because it didn't involve some physical assault or trauma. It's certainly true that Steffens's injury was largely economic—although an injury that affects someone's emotional and mental health *is* also physical in some sense, *see Roby v. McKesson Corp.*, 47 Cal.4th 686, 713 (Cal. 2009)—but a wrongful termination certainly cuts much closer to the bone than the bad faith denial of coverage by an insurance company. The Ninth Circuit recognized as much in *Zhang*, when it held that "[a]lthough *BMW* held that 'purely economic' harms are less likely to warrant substantial punitive damages awards, intentional discrimination is a different kind of harm, a serious affront to personal liberty." *Zhang*, 339 F.3d at 1043. True, the Court has previously distinguished this wrongful termination case from a discrimination case brought under the Fair Employment and Housing Act, but it's not unreasonable to lump, for reprehensibility purposes, a wrongful termination for alleging unlawful labor practices with racial discrimination. In *Zhang*, it's worth noting, the Ninth Circuit upheld a $2.6 million punitive damages award where compensatory damages were $360,000.

The next two factors—whether Steffens's termination evinced an indifference to her health and safety *and* whether she was vulnerable—can be lumped together here. Regus seems to interpret the first of these as an inquiry into whether the alleged misconduct affected more than one person, simply because *State Farm* says "health or safety of *others*," in the plural. The Court doesn't adopt this self-serving reading of the case. To be sure, "[evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible." *Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007). But that doesn't mean that single-victim misconduct is inherently non- or less reprehensible, and there's certainly no requirement in *State Farm* that for the second reprehensibility factor to be satisfied a defendant must have harmed more than one party. The question, after all, is whether Regus was indifferent to *Steffens's* health or safety. Regus also misreads the third reprehensibility factor, taking it to mean a defendant must have targeted a plaintiff *because* that plaintiff was vulnerable. In fact, the factor simply looks to whether a plaintiff *was*

vulnerable, not whether that plaintiff's vulnerability motivated the defendant's action. With that understanding, the Court is inclined to say the factors are satisfied. Regus could have, and perhaps should have, anticipated that firing Steffens would cause her emotional distress and suffering, which would constitute indifference to her health, and it could have anticipated that she would suffer financially under the circumstances, which speaks to her vulnerability. *See Roby*, 47 Cal.4th at 713.

That brings the analysis to the question whether Regus's misconduct was a single, isolated incident and whether it was the result of malice or deceit versus a mere accident. *Maybe* the first of these factors favors Regus. Steffens did allege, after all, a single wrongful termination based upon a single report of meal and rest break violations in October 2006. Although, as Steffens points out, there was arguably a series of wrongful acts that led to the termination, including Golgart's immediate decision after the October 2006 meeting to fire Steffens. The second, factor, though, certainly does not favor Regus, because there was adequate evidence presented for the jury to conclude that Steffens's termination was malicious rather than accidental or some kind of administrative oversight.

Considering the above, the Court finds that the actions Steffens's complained of, which the jury found Regus committed, were sufficiently high on the reprehensibility scale to support a severe punitive damages award. At least, the Court isn't inclined to adjust the award downward based on its own judgment that the reprehensibility of Regus's conduct wasn't what the jury appeared to believe. The Court therefore considers the first prong of the due process analysis satisfied in this case.

### 2. Ratio

The jury awarded Steffens $1,146,252 in compensatory damages and $3.5 million in punitive damages, a ratio of approximately 3:1. At least on its face, that ratio isn't even remotely constitutionally problematic. The ratio in *State Farm* was 145:1—$145 million in punitive damages and $1 million in compensatory damages—and in *Gore* it was 500:1—$2 million in punitive damages and $4,000 in compensatory damages. *See State Farm*, 538 U.S. at 412; *Gore*, 517 U.S. at 582. Moreover, the Supreme Court suggested in *State Farm*

that so long as the ratio is in the single digits, it's presumptively reasonable and needn't be subject to constitutional scrutiny. *State Farm*, 538 U.S. at 425 ("We declined again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

Drawing on this, the Ninth Circuit in *Zhang*—which, again, was a wrongful termination case—said, "We are aware of no Supreme Court or Ninth Circuit case disapproving of a single-digit ratio between punitive damages and compensatory damages, and we decline to extend the law in this case." *Zhang*, 339 F.3d 1020. (The ratio in *Zhang* was 7:1, $2.6 million in punitive damages and $360,000 in compensatory damages.) When the Ninth Circuit has found that a punitive damages award was excessive, it has remanded it for a "constitutionally acceptable" ratio in the single digits. *See Bains LLC v. Arco Prods.Co.*, 405 F.3d 764 (9th Cir. 2005). The jury in *Bains* had awarded a company $50,000 in compensatory damages in a breach-of-contract case, $1 in compensatory damages on a related racial discrimination claim, and $5 million in punitive damages. *Id.* at 769. The Ninth Circuit remanded for punitive damages to be set somewhere in the $300,000 to $450,000 range.

Faced with this caselaw, Regus seizes on a statement in *State Farm* that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. It even cites a case in which the California Supreme Court, following *State Farm*, concluded "a one-to-one ratio between compensatory and punitive damages is the federal constitutional limit here." *Roby*, 47 Cal.4th at 719. *Roby* was a wrongful termination case. The plaintiff alleged that she was fired on account of a disabling medical condition, and the jury awarded her $3,511,000 in compensatory damages and $15 million in punitive damages against her employer, as well as $500,000 in compensatory damages and $3,000 against a supervisor who harassed her. *Id.* at 692–93. The question the

California Supreme Court faced–skipping over adjustments by the trial court and Court of Appeal—was where to cap punitive damages, or if to cap them, when the compensatory damages were $1,905,000. *Id.* at 712–20. It held that a ratio of 1:1 was the limit, and it found this ratio was compelled in part because the non-economic damages were sufficiently high in relation to the compensatory damages—$605,000 in economic damages, $1.3 million in non-economic damages—that they included a punitive component anyway. *Id.* at 797.

While the ratio of non-economic to economic damages in this case is slightly higher than in *Roby*, and therefore open to the interpretation that it included a punitive component, there is a meaningful difference between that case and this one—going more to the reprehensilbility prong of the analysis—the counsels against imposing a 1:1 ratio on the punitive damages award. In *Roby*, the California Supreme Court saw some reprehensibility but not a lot; in fact, it was "at the low end of the range of wrongdoing that can support an award of punitive damages under California law." This in large part because the plaintiff's termination resulted from the one-time application of an ostensibly neutral attendance policy that didn't accommodate the plaintiff. *Id.* at 714–15. The Supreme Court, unlike the Court here, even went as far as to say there was no evidence of malice:

> Nevertheless, the corporate conduct falls short of "intentional malice." The evidence does not suggest that employer McKesson adopted the attendance policy in question—and in particular the requirement of 24-hour advance notice for all absences—with a purpose or motive to discriminate. Rather, McKesson's apparent purpose in requiring 24-hour advance notice was to enable advance planning by its supervisors and thus ensure adequate staffing levels on a daily basis. McKesson's wrongdoing was more a failure to prevent the foreseeable discriminatory consequences flowing from its otherwise appropriate attendance policy than it was an act rooted in "intentional malice." *Id.* at 796.

The California Supreme Court even found certain demerits to the plaintiff's case, for example that she had missed a lot of work, with no notice and with progressive disciplinary warnings, without invoking her disability. *Id.* at 716–17. Also, her employer wasn't substantially informed as to the nature of her disability and the accommodations it required. *Id.* at 717. //

- 43 -

1     Nothing comparable to that must be said in this case.  The jury heard evidence
2     suggesting that Golgart wanted Steffens fired because of her complaints about meal and
3     rest breaks, and it heard evidence that Regus even tried to cover this up, first with a phony
4     performance improvement plan and then by Golgart in his own deposition.  Indeed, if the jury
5     believed Steffens and Jones that she raised meal and rest breaks during the October 2006
6     meeting, it necessarily found that Golgart perjured himself by testifying that she ever raised
7     the issue.  The point here is simply that the California Supreme Court's holding in *Roby*
8     rested chiefly on its finding that the defendant's conduct was at the low end of the
9     reprehensibility scale, and that's a finding the evidence doesn't necessarily compel in this
10    case.  The Court therefore finds no problem with the 3:1 ratio of punitive to compensatory
11    damages in this case, and in fact finds it to be in line with other ratios upheld by the Ninth
12    Circuit.  *See Zhang*, 339 F.3d at 1044; *Bains*, 405 F.3d at 777.

13                              **3.      Comparable Penalties**

14         The California Supreme Court in *Roby* noted that if the plaintiff had pursued her
15    FEHA claim administratively before the California Fair Employment and Housing
16    Commission, it could have assessed a fine not exceeding $150,000.  Given that this amount
17    was "tiny by comparison to the jury's punitive damages award . . . of $15 million," the court
18    said this final guidepost weights in favor of a constitutional limit.  Regus tries to make that
19    very argument here: "Steffens, like the plaintiff in *Roby*, could have pursued an
20    administrative claim for retaliation under the FEHA before California's Fair Employment and
21    Housing Commission."  (Doc. No. 153 at 37.)

22         This is flat wrong, though.  The claim here was a common law tort for wrongful
23    termination in violation of public policy.  It wasn't brought under the FEHA, and indeed
24    couldn't have been brought under the FEHA, because Steffens's didn't allege that she was
25    terminated on the basis of a protected characteristic such as race or sex.  Considering the
26    three guideposts for assessing the constitutionality of a punitive damages award, the Court
27    simply doesn't find that the jury's award in this case violated due process.  Regus's motion
28    for a new trial, or a remittitur, is **DENIED**.

**VI.    Misconduct**

Regus's final set of arguments for a new trial allege misconduct on the part of opposing counsel, a witness, and a juror.  The Court will consider these arguments one at a time.

**A.    Misconduct of Opposing Counsel**

Regus has identified four instances in which, during opening and closing statements, counsel for Steffens suggested that this case is about Regus's policy of denying meal and rest breaks to employees, rather than about its alleged termination of Steffens for speaking up about that.  For example, Ms. Panuco opened her opening statement by saying:

> The evidence will show that this case is about a corporation that made its profit by denying hourly workers the meal breaks and rest breaks that they are entitled to under California law.
> The evidence will show that the corporation made its profit, revenue and saved money by making sure that its hourly employees weren't getting the rest breaks and meal breaks that they are entitled to by California law.  When Ms. Steffens said that is illegal, she was fired. (3/18/13 Tr. at 96:6–14.)

And during his closing statement, Mr. Stormer said:

> Now, if they had come before you and said, "I'm sorry, but she was going to be fired anyway.  You know, I may have overreacted to her complaint," well, maybe that would show a little bit of remorse and that they might not do it in the future.  But instead, they came before you and said, "Never happened," showing not one bit of remorse.  Completely reprehensible.  Then it also caused harm, that behavior, to other people.  Those people who did not get their lawfully entitled breaks and—rest breaks and meal breaks.  (3/22/13 Tr. at 8:17–25.)

Regus argues that these statements not only mis-framed the case but so inflamed the jury that it awarded damages as if this case were a straightforward meal and rest break class action.

"Generally, misconduct by trial counsel results in a new trial if the flavor of misconduct sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict."  *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1192 (9th Cir. 2002).  But that standard doesn't apply here, or at least some heightened version of it does, because Regus didn't object to any of these statements during

trial, nor did it ever move for a mistrial because of them. *Hemmings* suggests that the Court reviews only for plain or fundamental error—although it's not exactly clear how this differs from the general standard of review. *Id.* at 1192. In any event, even assuming it was error to suggest this case is about Regus's denial of meal and rest breaks—Steffens did have to show she had a good faith belief these denials were real—the Court would find no prejudice here.

For starters, the Ninth Circuit in *Hemmings* found no prejudice where the alleged misconduct "was an isolated, short comment during a closing statement that covered 66 pages when transcribed." *Id.* at 1194. The same can be said here. Regus has seized on one statement in Steffens's 10-page opening statement, two statements in about 30 pages of closing arguments (3/21/13 Tr. at 176:3–23, 187:4–12), and one statement in Steffens's supplemental 5-page supplemental statement on punitive damages. Looking at those statements under the totality of the circumstances, the Court doesn't find them prejudicial. *See Cooper v. Firestone Tire and Rubber Co.*, 945 F.2d 1103, 1107 (9th Cir. 1991) (affirming district court's ruling that a new trial was not warranted where allegedly improper statements were made only during the argument phase of trial, were isolated rather than persistent, and weren't objected to at the time).

Second, and speaking directly to the totality of the circumstances, the jury was adequately and carefully instructed that this case is about Regus's conduct with respect to Steffens's only. Indeed, after Mr. Stormer's last statement in closing argument that Regus now pounces on, he said, "You may not set the amount of any punitive damages in order to punish the Defendant for harm to anyone other than the Plaintiff, but you can set the damages to deter them from doing something to someone else." (3/22/13 Tr. at 9:1–5.) That was exactly the Court's instruction. (Doc. No. 144 at 21–22.) The Court has no concern that the remarks Regus now problematizes steered the jury's attention away from the core and only issue in this case, namely whether Regus terminated Steffens for complaining that employees weren't receiving meal and rest breaks. The motion for a new trial based on counsel's remarks is **DENIED**.

### B. Misconduct of Jones

Regus next argues that Jones perjured himself at trial and that newly acquired evidence would substantially dent his credibility before the jury. The essence of his alleged perjury is that he testified in his deposition that he never spoke with anyone at Regus, apart from Edmondson, about Steffens's termination, and then testified at trial that he spoke with Regus's general counsel 10–15 times.

When Jones was deposed and asked if he reported the nefarious nature of Steffens's termination up the Regus flagpole, he said he did not.

> Q: And you could have called human resources at any time to either get clarification on issues or if you did not like an issue you could go to human resources to get support, correct?
>
> A: Correct.
>
> Q: And you've done that in those kinds of situations while employed at Regus when something was not your liking you knew how to go to HR and get support and/or feedback on an issue, correct?
>
> A Correct.
>
> Q: You did not do that in this situation, correct?
>
> A: I did not. (Doc. No. 153-2 at 11–12.)

He gave essentially the same answer when asked specifically if he contacted anyone in human resources to report that he was being tasked with firing Steffens even though the Emerald Plaza center was doing well.

> Q: And even though you've had past occasions to call human resources to get support and feedback you never contacted anybody in HR and said look I got an issue here with the area vice president who's asking me to get rid of an employee that is running a center that's doing well?
>
> Q: On that day or any point in time?
>
> Q: At any point in time?
>
> Q: Ever did that?
>
> A: I never called HR in regards to that day in response to the area VP's response. (Doc. No. 153-2 at 13.)

//

08cv1494

Jones did testify during his deposition that he spoke with Edmondson over the telephone in September 2007 after he'd received a DFEH complaint filed by Steffens, but he also testified that he didn't raise the illegality of her termination or discuss Steffens's termination with anyone else at Regus.

> Q: Since that time have you had any discussions with Sharon Edmondson or Sande Golgart or anybody else at Regus as to what occurred in that October 2006 meeting, other than your deposition testimony.?
>
> A: Since my deposition?
>
> Q: Other than your deposition testimony - -
>
> A: Okay.
>
> Q: - - and other than this brief call with Sharon Edmondson, did you discuss that October 2006 meeting with anybody else at Regus?
>
> A: No.
>
> Q: No one followed up with you after that telephone call with Sharon Edmondson?
>
> A: I had a phone conversation with Sharon letting her know that I had received paperwork from Denise Steffens but nothing else pertaining that meeting.
>
> Q: To that meeting?
>
> A: To that meeting.  (Doc. No. 153-2 at 17–18.)

Jones also testified that he never put in writing to the effect that he disagreed with Steffens's termination or thought it may have been illegal.  (Doc. No. 153-2 at 19.)

At trial, however, Jones mentioned multiple phone conversations he'd had with Regus's counsel Noah Pollack—whose last name he thought was Polk—after September 2007, and he further testified that he told Pollack he thought Steffens's termination was illegal:

> Q: And do you know what date it was that you provided your declaration?
>
> A: Approximate June of 2008.
>
> Q: And that notice that you received from Ms. Steffens, when did you receive that?

08cv1494

1    A: Looks like September of '07.

2    Q: Roughly nine months earlier?

3    A: Correct.

4    Q: And in that nine-month period, did you hear from any lawyers,
     including myself?
5
     A: No, I did not.
6
     Q: Did you hear from any Regus lawyers?
7
     A: I did.
8
     Q: And from whom?
9
     A: I don't remember his first name, but Polk was, I believe, his
10   last name.

11   Q: Mr. Polk contacted you when first?

12   A: Sometime after receiving this document. I don't recall when.

13   Q: At that time, did you tell Mr. Polk that you believed Ms.
     Steffens had been terminated because she complained about
14   Regus' illegal conduct related to denying meal and rest breaks?

15   A: I did share those thoughts with him, yes.

16   Q: After you left Regus I believe in — Was it October of 2007 or
     November of 2007?
17
     A: November.
18
     Q: After you left Regus in November of 2007, did you hear from
19   Mr. Polk again?

20   A: I did.

21   Q: On approximately how many occasions?

22   A: 10, 15 times.

23   Q: How many months or years did that continue?

24   A: I don't recall how many — It wasn't years that that continued.

25   Q: Did it continue including after the point that you provided your
     declaration?
26
     A: Yes, it did.
27
     Q: Did you cooperate with him?
28
     A: I talked with him. Yes. (3/20/13 Tr. at 93:24–95:15.)

08cv1494

Regus has now obtained a declaration from Pollack saying this simply isn't true.  Pollack says, for example, "During my employment as the General Counsel of Regus, I do not recall speaking with Regus Area Director Shannon Jones about General Manager Denise Steffens's employment at Regus or the termination of her employment.  In fact, I have no recollection of ever speaking with Shannon Jones."  (Doc. No. 153-3 at 2.)

Just to be clear, the only apparent contradiction here is between Jones's deposition testimony that he didn't speak with anyone at Regus other than Edmondson about Steffens's termination and his trial testimony that he spoke with Pollack about it on a number of occasions.[12]  It's not clear at all to the Court how Jones's deposition testimony that he never complained about Steffens's termination to HR *at the time* contradicts his trial testimony that he spoke with Regus's general counsel about it after Steffens had filed a legal grievance.

In order for the Court to order a new trial here, Regus has to show that it discovered the evidence after trial, that it could not have discovered it sooner through the exercise of reasonable diligence, and that the new evidence is so significant that it would likely have changed the outcome of the case.  *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 998 (9th Cir. 2001).  The Court finds that Regus can't make the second and third of these showings.

With respect to the second, there's no explanation from Regus as to why it couldn't have reached out to Pollack immediately after Jones's testimony, on the third day of a five-day trial.  Certainly, there is no explanation as to why it took until June 19—the day Pollack signed his declaration, and nearly three months after the trial—to acquire Pollack's testimony.  And second, Pollack was a former *Regus* employee who was obviously involved in the handling of Steffens's lawsuit in the early stages.  It's unclear why, over the course of

---

[12] In a footnote in her opposition brief Steffens cites additional deposition testimony to suggest there was no inconsistency in Jones's testimony considering the precise questions he was asked and answered, but the Court isn't inclined to get into that level of detail and parse Jones's testimony.  Jones was asked during his deposition if he discussed the October 2006 meeting with anyone at Regus other than Edmondson and he said no.  Then, at trial, he testified that he talked to Pollack about Steffens termination and said he believed it was in retaliation for her reports about meal and rest breaks—which almost certainly had to include some discussion of the October 2006 meeting.  Indeed, Jones answered "Yes" when asked if he told Pollack that Steffens had been terminated for her statements in the October 2006 meeting.  (3/20/13 Tr. at 6:7–12.)  That's arguably an inconsistency.

this case before it went to trial, Regus never though to ask him if he had any conversations with anyone pertaining to Steffens's termination. Had it asked that question, Pollack could have either been a witness himself or been on standby as an impeachment witness. So, the Court first finds that Regus could have acquired the new evidence sooner through the exercise of reasonable diligence.

The Court also finds that this newly-acquired evidence was not "of such magnitude that it would likely have changed the outcome of the case." *Far Out Productions*, 247 F.3d at 998. The most obvious reason for this is that Regus was still able to impeach Jones, at least partially, with his deposition testimony—and it could have further impeached him by actually quoting that testimony. After Jones mentioned his conversations with Pollack, counsel for Regus said "Sir, I took your deposition on two separate occasions. This is the first time you've ever said that, correct?" (3/20/13 Tr. at 6:15–17.) Jones answered "I believe it is." (3/20/13 Tr. at 6:18.) Also, as important as Jones's testimony may have been to Steffens, it's a stretch to say that merely calling his credibility into question would *likely* have caused the jury to return a verdict for Regus. This is especially true considering that trial testimony can always be parsed or finessed to make it appear that the precise question asked wasn't previously asked, or that a particular answer isn't exactly in contradiction to a previous answer. Indeed, Steffens has attempted just such a parsing here. (Doc. No. 156 at 40. n.22.)

Because the Court finds that Regus has failed to show that it couldn't have acquired the evidence at issue sooner, and that the evidence wouldn't likely have changed the outcome of the case, it **DENIES** Regus's motion for a new trial.

**C.    Misconduct of Juror Smith**

Regus has submitted the affidavit of a juror, Donald Holcomb, stating that another juror brought biases into the deliberations that she expressly disavowed during voir dire. Specifically, juror Smith was effectively asked by the Court during voir dire if anything in her experience or her family members' experience would impact her ability to be a neutral factfinder in this case and she said no. (3/18/13 Tr. at 30:8–31:5.) Counsel for Regus also

- 51 -

asked the jury generally "Is there anything, anything, the littlest thing, the biggest thing that you haven't shared with us that you think we should know in selecting a jury" and juror Smith did not respond. (3/18/13 Tr. at 65:21–24.) Holcomb's affidavit, though, says that before deliberations Smith "shared with the jurors that her mother went through a very similar situation as Ms. Steffens and was terminated as well." (Doc. No. 153-4 at 2.) He also said that Smith wasn't even interested in deliberating, but simply in awarding Steffens as much money as possible: "Ms. Smith then led the deliberations and immediately focused on how much money we should give Ms. Steffens. Instead of focusing on the facts of Ms. Steffens's case, Ms. Smith kept repeating her mother's story and insisted that we give Ms. Steffens as much money as we could." (Doc. No. 153-4 at 2.)

Holcomb's affidavit, however, is plainly excluded under Federal Rule of Evidence 606:

> During an inquiry into the validity of a verdict, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

There are exceptions to this rule, but none covers Holcomb's affidavit here.

> A juror may testify about whether:
>
> (A) extraneous prejudicial information was improperly brought to the jury's attention;
>
> (B) an outside influence was improperly brought to bear on any juror; or
>
> (C) a mistake was made in entering the verdict on the verdict form. Fed. R. Ev. 606(b)(2)

The misfortune of Smith's mother, which she allegedly brought into the jury room, was neither extraneous prejudicial information brought to the jury's attention *or* an outside influence improperly brought to bear on the jury, despite Regus's argument to the contrary. *See United States v. Budziak*, 697 F.3d 1105, 1111 (9th Cir. 2012) ("The alleged juror comments referred not to extraneous evidence, but to the jurors' personal life experiences . . . .); *Price v. Kramer*, 200 F.3d 1237, 1255 (9th Cir. 2000) (recognizing that

08cv1494

jurors' personal experiences did not constitute extraneous evidence). As the Tenth Circuit has put it, "A juror's personal experience, however, does not constitute 'extraneous prejudicial information.'" *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1223 (10th Cir. 2005). The affidavit is therefore excluded and Regus's argument that juror misconduct merits a new trial is a non-starter. The motion for a new trial is **DENIED**.

## VII. Conclusion

The jury's verdict in this case obviously came as a surprise to Regus, and was probably tough to swallow. But tough to swallow does not mean legally excessive, nor does it mean the Court, or opposing counsel, or jurors, must have done something wrong. This case was vigorously and ably tried by competent lawyers, and Regus simply lost. Now, having carefully reviewed the record in the case, and having carefully considered all of Regus's arguments for a new trial—serious and flimsy arguments alike—the Court finds that Regus needs to accept that loss. The jury's verdict stands. Regus's motion for a new trial is **DENIED** in its entirety.


**IT IS SO ORDERED**.

DATED: August 16, 2013

**HONORABLE LARRY ALAN BURNS**
United States District Judge

08cv1494